Raymond A. ESTABROOK [1], Plaintiff,

v.

Kenneth S. APFEL,[2] Commission of
Social Security, Defendant.

No. 3–97–CV–90147.

United States District Court,
S.D. Iowa,
Davenport Division.

July 30, 1998.

---

1. On February 19, 1998, an Amendment To Complaint Pursuant To F.R.Civ.P.Rule 17 was filed to inform the Court that Plaintiff has died. The Amendment asked the Court to substitute Plaintiff's son as the party of interest. The Amendment is actually a Motion To Substitute Party. The knowledge of Plaintiff's death had no bearing on the Court's decision to reverse the Commissioner's final decision. 42 U.S.C. §§ 402(i), and 404(d) sets out the procedure for determining payment of benefits to a person who dies with past due benefits still owing. *Pettijohn v.* *Heckler,* 759 F.2d 669, 670 n. 1 (8th Cir.1985). Therefore, the Motion To Substitute Party is denied.

2. President Clinton appointed Kenneth S. Apfel to serve as Acting Commissioner of Social Security, effective September, 29, 1997, to succeed John J. Callahan. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, Kenneth S. Apfel is hereby substituted for John J. Callahan as defendant in this action.

Michael DePree, Davenport, IA, for Plaintiff.

Christopher D. Hagen, Assistant U.S. Attorney, Des Moines, IA, for Defendant.

## MEMORANDUM OPINION AND ORDER

PRATT, District Judge.

Plaintiff, Raymond A. Estabrook, filed a Complaint in this Court on August 19, 1997, seeking review of the Commissioner's decision to deny his claim for Social Security benefits under Title II and Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, 1381 *et seq.* This Court may review a final decision by the Commissioner, 42 U.S.C.

§ 405(g). For the reasons set out herein, the decision of the Commissioner is reversed.

## BACKGROUND

Plaintiff filed his applications for benefits September 21, 1993. Tr. at 99–107. Plaintiff claimed that he became disabled August 22, 1993. Plaintiff's date last insured for Title II purposes is June 30, 1994. Plaintiff's applications were denied initially and upon reconsideration and Plaintiff requested a hearing before an Administrative Law Judge. On December 27, 1994, the ALJ remanded the case to the reconsideration stage to obtain additional physical and mental examinations. Tr. at 142–44. Plaintiff's claims were again denied on reconsideration (Tr. at 173–77) after which Plaintiff again requested a hearing. Tr. at 178. After a hearing in front of Administrative Law Judge John P. Johnson (ALJ) (Tr. at 52–97), a Notice of Decision— Unfavorable was issued on January 25, 1997. Tr. at 12–41. A request for review by the Appeals Council was denied July 19, 1997. Tr. at 7–9. This appeal followed.

## MEDICAL EVIDENCE

The medical evidence in this case begins with a discharge summary from Mercy Hospital in Iowa City, Iowa. Plaintiff was admitted January 15, 1993 and discharged two days later on the 17th. Plaintiff had presented himself, upon referral from Dr. Swayze, with headaches which began in his early 20's. The headaches generally occurred in clusters lasting 3 weeks to 3 months. During the previous month, Plaintiff had been "literally in bed because of intensities occurring about 2 to 10 times a day and last anywhere from 10 minutes up to 3 to 4 hours." The pain was described as a sharp pain in the right temporal region with pain above the right ear and the right eye. Plaintiff also had water in his eye and nose, and had nausea and vomiting. Upon arrival, Plaintiff "appeared to be in an acute degree of discomfort." A CT scan of the head was entirely normal. Plaintiff was started on Lithium Carbonate which essentially resolved the headache. Tr. at 223.

On August 21, 1993, Plaintiff saw James L. Blouse, a physician's assistant for Mark S.

Odel, M.D. for concrete burns of both lower extremities. Plaintiff reported that the previous day he had been working in concrete and on his way home noticed that his legs and ankles were burning. Tr. at 234. Dr. Odell wrote to Robert Sandahl, an examiner at Disability Determination Services, on November 4, 1993. Dr. Odell had not understood that an examination was requested and so "a very limited exam was done". Dr. Odell noted that Plaintiff complained of head and back aches. The doctor's examination revealed that Plaintiff has a very limited range of motion of the lumbar back. Tr. at 235.

On September 17, 1993, V. Warren Swayze, M.D., wrote a short note addressed "To whom It May Concern": "Raymond Estabrook is my patient, due to his back condition which restricts his activities, I have advised him to terminate his present employment as a construction laborer with local 1238 in Iowa City, Iowa. There may be some less exertional form of activity Raymond can be retained for, but he should not continue his present work." Tr. at 246.

On October 14, 1993, the Iowa Department of Job Service issued a decision on Plaintiff's application for unemployment benefits. The Department found that Plaintiff was required to leave his employment on the advice of his doctor because of an illness or injury directly connected with the employment which made it impossible to continue employment because of serious danger to the employee's health. Tr. at 278.

Statements from two employers were submitted to the Social Security Administration on which 1993 earnings were reported. Realm Construction reported 1993 earnings of $659.81. Tr. at 282. Civil Construction reported 1993 earnings of $189.12. Tr. at 286.

On November 1, 1993, Dr. Swayze filled out a form for Disability Determination Services. On this form Dr. Swayze stated that Plaintiff could lift 10 to 15 pounds, but "goes down on knees with any lifting." Dr. Swayze said that standing, moving about, walking, and sitting in an eight hour day were "impossible." Dr. Swayze wrote: "Can stand or walk short time resulting in great pain." Tr. at 248. In a letter dated April 15, 1994, Dr.

Swayze stated that he was not prepared to complete a questionnaire concerning Plaintiff's permanent impairments. Dr. Swayze suggested examinations by an orthopedist and a psychologist to evaluate Plaintiff's disability. Tr. at 247.

On July 20, 1994, Richard F. Neiman, M.D. wrote to Dr. Swayze. Plaintiff saw Dr. Neiman because of a tremor which Dr. Swayze thought was caused by Parkinson's disease. Dr. Neiman was of the opinion that the dosage of Lithium, prescribed for the headaches, was too high and recommended dropping the dosage to 300 mg. 4 times a day. Dr. Neiman also noted Plaintiff's back pain. Tr. at 267. Dr. Neiman wrote: "I think he has a considerable amount of problems regarding his back which would certainly preclude his return to construction work. He has also had severe headaches. Frankly, I think he is now unemployable and would support his claim for disability." Tr. at 268.

Plaintiff was seen for a psychiatric examination by James Yeltatzie, M.D. on February 15, 1995. Plaintiff related that, while working construction, he sustained a work related injury that required back surgery. After he recovered, he returned to work and sustained a second injury which also required back surgery. Once again Plaintiff returned to work and injured his back a third time. This time, when surgery was offered, Plaintiff declined. Tr. at 255. Dr. Yeltatzie noted "a circumducting and slow gait." On mental status examination, Plaintiff's mood was dysphoric, and his affect was labile on the verge of tearfulness. The doctor's impression included major depressive disorder, single episode, moderate. Tr. at 256. Dr. Yeltatzie concluded his report:

> Raymond would have difficulties in being able to remember and understand any instructions, procedures or locations. The pain that he feels as well as his depression impair his attention span, concentration and his ability to work at any sort of pace. His problems with his temper and anger also would affect his ability to interact socially whether it be with the public at large, any co-workers and definitely with any supervisors. Raymond would be able to adapt to changes but would find this to

be very difficult. He would be able to handle any of his own financial matters. Tr. at 257.

Plaintiff was seen by Dr. Neiman on February 7, 1995, for a physical examination at the request of Disability Determination Services. Plaintiff walked with a cane and put weight on the left foot only on the heel. Dr. Neiman wrote that the first back surgery had been done at the University of Iowa in 1982. The second surgery was in 1989. Plaintiff reported that he was in constant back pain. Plaintiff also reported cluster headaches but said that the headaches had improved somewhat since taking Lithium on a routine basis. Tr. at 259. After his examination, Dr. Neiman wrote:

> His ability to lift and carry probably would be characterized by 5 to 10 pounds at maximum. He needs to be able to change positions and move about. He cannot sit, walk or stand for an 8 hour day, probably more like a 2 hour day. Stooping, climbing, kneeling, crawling are next to impossible. Handling objects would be possible. Temperature change should be avoided. Prolonged traveling in a car probably ½ hour to an hour should be avoided since it aggravates the problem with the back. The work environment, temperature change should be avoided.
>
> From my viewpoint I think he is totally disabled for all occupations. The back itself is enough to cause problems, intermittent headaches are certainly an aggravating factor. I am not sure there is much more we can do for his back. . . .
>
> His headaches seem to be under reasonable control. However, when he has headaches he is out probably three to four days. The long term side effects of medication require constant monitoring as far as the Lithium. He does take a fair amount of medicine otherwise to help control the pain. He walks around the use of a cane.

Tr. at 260.

An X-ray study of Plaintiff's back, dated February 24, 1995, showed severe degenerative disc disease at L5–S1 with markedly diminished disc height and sclerosis of the adjoining vertebral body end plates. There was also osteophytosis at that level. The study also showed facet arthropathy at the L5–S1 level bilaterally. Finally, the study showed moderate degenerative disc disease at L4–5. Tr. at 274.

A medical assessment of residual functional capacity form was completed by William Catalona, M.D. on November 18, 1995. Tr. at 294–98. Dr. Catalona opined that Plaintiff could lift a maximum of 10 pounds, and "none" frequently. Tr. at 294. The doctor opined that Plaintiff could walk 15 to 20 minutes at a time for a maximum of 4 hours during a day. He said that Plaintiff would be able to sit for an hour at a time, or a maximum of three hours a day. The doctor also said that Plaintiff needed to alternate between sitting and standing every 30 minutes. Tr. at 295. According to Dr. Catalona, Plaintiff should never climb, balance, crouch, kneel or crawl. He could occasionally stoop or reach overhead. Plaintiff could occasionally reach and handle, but should never push/pull or bend forward and downward from the waist. Tr. at 296. Dr. Catalona opined that Plaintiff was unable to work at all. Tr. at 298.

In a letter to Dr. Swayze dated May 9, 1995, Dr. Neiman wrote that he was aware that Plaintiff had been denied Social Security benefits and was of the opinion that there were "some errors regarding his evaluation." Dr. Neiman wrote:

> [H]is principal difficulty consists of the back surgery which was performed on two different occasion (sic) in 1982 and 1989 as well as that of the headaches. The frequency of headaches tend to vary. Over the last two years he has had one lasting the entire summer of three months and he had some headaches in the spring as well. They are really quite disabling to say the least. During the time he has the headaches he is unable to do any occupations at all. He has continued difficulties as far as the lower back. He is generally taking Fiorinal for his headache and back and also Percocet. He is still on the lithium 300 mg. 3 × a day.

Tr. at 309. Dr. Neiman concluded his report: "I still think he is disabled for all occupations and I so advised him." Tr. at 310.

In a letter to Plaintiff's attorney, Dr. Yeltatzie stated that he saw Plaintiff February 22, March 15, April 12, May 1, and May 21, 1996 for his major depressive disorder. Plaintiff's medication included Prozac, Valium, Lithium, Percodan, and Fiorinal. Tr. at 322.

In a report to Dr. Yeltatzie dated July 11, 1996, Dr. Neiman indicated that Plaintiff was being treated for chest pain which was of concern because of a strong family history of heart problems. Dr. Neiman also noted that Plaintiff and his wife were about to get a divorce. Plaintiff also continued to have back pain with positive straight leg test on the left side. Tr. at 328.

The medical treatment records conclude with office notes from Dr. Yeltatzie the last of which is dated November 15, 1996. Tr. at 338–42. Notes in June and July, 1996, indicate that Plaintiff and his wife planned a vacation trip to Hawaii. Tr. at 339. When Plaintiff returned from this trip, he told the doctor that it had not gone well because of fighting with his wife and brother-in-law. Tr. at 340. The records indicate that Plaintiff continued to suffer from headaches and back pain, as well as major depressive disorder. The notes also indicate that Plaintiff's wife had filed for a divorce. Tr. at 342. On December 2, 1996, Dr. Yeltatzie wrote a note addressed "To Whom It May Concern" on which he opined that Plaintiff's psychiatric condition significantly impairs his ability to be gainfully employed, and that the prognosis for improvement was poor. Tr. at 350. Dr. Neiman wrote a letter November 25, 1996 in which he certified that Plaintiff meets the definition of "handicapped" in Iowa Code, Chapter 321L [3]. Tr. at 349.

### HEARING TESTIMONY

At a hearing held December 3, 1996 (Tr. at 52–97), Plaintiff testified that he had done concrete construction work for 20 years. Tr. at 57. "I was a tender, what they call a mason tender. I have laid block and brick before but I was never a brick layer or a block layer." Plaintiff said that as a tender, he had to lift up to 100 pounds. Tr. at 74. Plaintiff said that he is unable to lift anything without pain. Tr. at 60. With his cane, Plaintiff said he is able to walk a block. He said that climbing stairs makes his hips and legs hurt. Tr. at 79. Plaintiff said that he is unable to stand or sit longer than 15 or 20 minutes. When asked about medication, Plaintiff said he takes Percodan for pain, Lithium for headaches, Prozac and Valium for mental health problems, and codeine for pain. Tr. at 61–63. Plaintiff said that he still has tremors in his hands and legs. Tr. at 63–64. When asked to describe his headaches, Plaintiff responded:

> Well, like somebody's trying to kill you. It feels like you're going to die. You—the way mine start, they start right in the back of my shoulder, then they'll go up over to my ear is what it feels like somebody's dumping hot lead or something into your—it feels like there's—my ears filling up with both fluid. And then it'll move all the way up over my temple and into my eye like an enormous amount of pressure behind my eye or to whatever. Any bright lights, any noise, anything but darkness is just sheer hell.... I get them where they're that bad probably two or three days out of a month, you know, it seems like that. And sometimes they last for like three months at a time. One right after another, after another. That's the cluster part, I guess.... [T]hat's why I can't make any plans because I can't predict when I'm going to have these headaches. They just—they come on....

Tr. at 65. Plaintiff said that his headaches had effected every one of his jobs, all of which were lost because of either headaches or back injuries. Tr. at 69. Plaintiff testified that he has trouble remembering. Tr. at 81.

---

**3.** Chapter 321L of the Iowa Code *Handicapped Parking* provides that a handicapped person "means a person with a disability that limits or impairs the person's ability to walk. A person shall be considered handicapped for purposes of this chapter under the following circumstances: a. The person cannot walk two hundred feet without stopping to rest. b. The person cannot walk without the use of, or assistance from, a brace, cane, crutch another person, prosthetic device, wheelchair, or other assistive device.... f. The person is severely limited in the person's ability to walk due to an arthritic, neurological or orthopedic condition."

Plaintiff was asked about his marriage, to which he responded:

Well, it's pretty much over with now because of this.... The main thing, that's the main being was that she couldn't afford to take care of me any longer. And that she couldn't wait for me to get my disability so she filed for a divorce. She basically kicked me out in April and she filed for a divorce about two months ago, three months ago and after 21 years of marriage. My life was ruined in 1981 when I got hurt. But it's just now coming to a head because I'm losing all my family and everything else.

Tr. at 71.

After Plaintiff testified, the ALJ called Jeff L. Johnson to testify as a vocational expert (VE). The ALJ asked two hypothetical questions both of which assumed a younger individual with a limited education, past relevant work background of construction worker II, and the following impairments: "He has degenerative disk disease of the lumbar spine with a history of back surgeries and complaints of low back and leg pain, cluster and migraine headaches, major depressive disorder, a history of alcohol abuse and antisocial personality trait disorder." Tr. at 92. The first hypothetical assumed the following residual functional capacity:

He can lift no more than 20 pounds, routinely lift ten pounds, with no standing of more than 30 to 60 minutes at a time, no sitting of more than 30 to 60 minutes at a time, and no walking of more than two to three blocks at a time with no repetitive bending, stooping, twisting, squatting, kneeling, crawling, or climbing. No repetitive pushing or pulling. No repetitive operation of foot controls. This individual should not work at unprotected heights or around hazardous moving machinery. He should not be exposed to more than moderate levels of dust or fumes. And he is not able to do very complex or technical work but is able to do more than simple, routine, repetitive work, which does not require very close attention to detail. He does require occasional supervision. He should not work at more than a regular pace utilizing three speeds of pace being fast, regular, and slow. And he should not

work at more than a mild to moderate level of stress.

Tr. at 92–93. In response, the VE testified that Plaintiff could not do his past relevant work and had no transferable skills (Tr. at 93), but that he could do jobs such as office helper, locker room attendant and surveillance monitor. Tr. at 94. Next, the ALJ asked the VE to assume that Plaintiff has the following residual functional capacity:

He could lift no more than five to ten pounds, with no standing of more than 15 to 20 minutes at a time, no sitting of more than 15 to 20 minutes at a time, and no walking of more than a block at a time, with no repetitive bending, stooping, squatting, kneeling, crawling, or climbing. No repetitive operation of foot controls with the left foot, no work which would require continuous fine manipulation. This individual should not work at unprotected heights or around hazardous moving machinery. He cannot perform work where he would be constantly subjected to bright lights. He is able to do only simple, routine, repetitive work, which does not require close attention to detail. He does require occasional supervision. He should not work at more than a regular pace and should not work at more than a mild level of stress.

Tr. at 94. In response, the VE testified that the limitations "would preclude competitive employment." Tr. at 95. Thereafter, Plaintiff's attorney asked the VE what effect headaches, which would require Plaintiff to lay down and avoid lights and noise, at a frequency of once a month to once every two months three to four days, would have on the ability to work. Tr. at 95–96. The VE stated that this limitation would also preclude competitive employment. Tr. at 96.

## ALJ'S DECISION

In his decision of January 25, 1997, the ALJ found, among other things, that Plaintiff suffers from the severe impairments listed in the hypothetical questions, and that he has a residual functional capacity consistent with the first hypothetical. The ALJ found that although Plaintiff is unable to do his past relevant work, he is able to jobs such as

those identified by the VE. Tr. at 29–30. The ALJ found that Plaintiff is not disabled, nor is he entitled to the benefits for which he applied.

## DISCUSSION

### STANDARD OF REVIEW

In reviewing administrative decisions, it is the duty of the Court to evaluate all of the evidence in the record, taking into account whatever in the record fairly detracts from the ALJ's decision. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951); *Piercy v. Bowen*, 835 F.2d 190, 191 (8th Cir.1987). *Easter v. Bowen*, 867 F.2d 1128, 1131 (8th Cir.1989). In *Bradley v. Bowen*, 660 F.Supp. 276, 279 (W.D.Ark.1987) the Court, Richard S. Arnold, Circuit Judge sitting by designation, wrote:

The standard of review of an administrative adjudication is whether it is supported by substantial evidence on the record as a whole. This is somewhat more probing than the "substantial evidence" test which is used by an appellate court when reviewing the fact-finding of a jury. *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987). While this Court will not second-guess a reasonable choice between two fairly conflicting views of the evidence (even if the Court, proceeding de novo, would have preferred the other choice), it will canvass the entire record to ensure that the ALJ in fact made such a reasonable choice. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951). Thus, it is not enough for the reviewing court simply to search the record for some evidence which will support the ALJ's conclusion. *Parsons v. Heckler*, 739 F.2d 1334, 1339 (8th Cir.1984). The Court must also review that evidence which "fairly detracts" from the ALJ's conclusion. *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 464. The weighing of conflicting evidence is generally a matter of fact-finding for the ALJ, and will not be disturbed on review if the result is one which " 'a reasonable mind might accept as adequate to support a conclusion.' " *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28

L.Ed.2d 842 (1971), quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938). But there are occasions when the bulk of the evidence is transparently one-sided against the ALJ's decision. In those instances, the reviewing court must reverse the administrative determination on the ground of unreasonableness. See *Gavin*, 811 F.2d at 1199–1201, and see generally, *Deuter v. Schweiker*, 568 F.Supp. 1414 (N.D.Ill.1983).

In short, a reviewing court should neither consider a claim de novo, nor abdicate its function to carefully analyze the entire record. *Wilcutts v. Apfel*, 143 F.3d 1134, 1136–37 (8th Cir.1998) citing *Brinker v. Weinberger*, 522 F.2d 13, 16 (8th Cir.1975).

### BURDEN OF PROOF

The ALJ found that Plaintiff is unable to return to his past relevant work. In *Talbott v. Bowen*, 821 F.2d 511, 514–15 (8th Cir.1987) then Chief Judge Lay wrote:

If the ALJ finds that the claimant cannot return to his past relevant work, the burden of proof shifts to the [Commissioner], who then has the duty to establish that the claimant is not disabled within the meaning of the Act.

.        .        .        .        .

In presenting evidence that a claimant is not disabled, the [Commissioner] must prove by medical evidence that the claimant has the residual functional capacity to do other kinds of work and that there are jobs available in the national economy that realistically suit the claimant. *O'Leary v. Schweiker*, 710 F.2d 1334, 1338 (8th Cir. 1983). "In determining whether there are job available that a claimant can perform, the [Commissioner] must consider the claimant's exertional and nonexertional impairments, together with the claimant's age, education, and previous work experience." *Id.*

In addition to proving with medical evidence that the claimant has a residual functional capacity to work, the Commissioner must also prove that jobs exist in the national economy that the claimant is able to perform. *O'Leary v. Schweiker*, 710 F.2d at

1338. See also, *Davis v. Callahan,* 985 F.Supp. 913 (S.D.Iowa 1997) and cases cited therein.

■ In the case at bar, the ALJ relied on the opinions of the doctors at Disability Determination Services who had reviewed the reports of Plaintiff's treating and examining physicians, but who had not personally examined plaintiff. The ALJ wrote that he relied more on these doctors because he did not find Plaintiff's testimony and contentions credible, and to the extent that the treating and examining doctors' opinions were based on Plaintiff's complaints, their opinions were discounted. The Court disagrees with this method of analysis.

■ The doctors who were called on to write reports for the Social Security Administration, were the same doctors who were treating Plaintiff. It is well settled law that when there is a conflict between the opinions of a treating and examining doctor, the greater weight is given to the treating doctor. *Hancock v. Secretary of Dept. of Health, Educ. and Welfare,* 603 F.2d 739, 740 (8th Cir.1979). Here, the treating and examining doctors are the same, therefore there is no conflict to be resolved. Likewise, in *Brock v. Secretary of Health & Human Services,* 791 F.2d 112, 114 (8th Cir.1986), the Court held that the opinions of doctors who have never personally examined the claimant but only reviewed the reports of examining physicians, do not constitute substantial evidence on the record as a whole. Further, as Judge Longstaff stated in *Soth v. Shalala,* 827 F.Supp. 1415, 1417 (S.D.Iowa 1993), drawing a conclusion regarding credibility is not equivalent to proving by medical evidence that a claimant has a residual functional capacity for other work. Finally, the Court disagrees that the doctors' opinions were based, exclusively, on Plaintiff's complaints, credible or otherwise. The reports from the physicians all contain objective medical findings which support their ultimate conclusions. What the ALJ did here, under the guise of a credibility finding, was to substitute his judgment for that of the physicians. It is the law of the Eighth Circuit that the ALJ must not substitute his opinion for those of the physicians. *Ness v. Sullivan,* 904 F.2d 432, 435 (8th Cir.1990).

■ Plaintiff claimed an onset of disability of August 22, 1993. The first medical opinion thereafter is from treating physician V. Warren Swayze, M.D. who, on November 1, 1993, stated, on a form provided him by Disability Determination Services, that Plaintiff can lift 10 to 15 pounds but that he "goes down on knees with any lifting." Dr. Swayze said that any standing, moving about, walking, and sitting in an eight hour work day was "impossible". Dr. Swayze said that while Plaintiff can stand or walk for a short time, it results in great pain. Dr. Swayze stated that Plaintiff had mild to moderate headaches with aura on a daily basis, although the headaches had improved somewhat since Plaintiff had begun taking Lithium. Tr. at 248. A few days later, on November 4, 1993, Mark S. Odell, M.D., another doctor who had treated Plaintiff, after a "very limited exam" stated: "Has very limited [range of motion] of the lumbar back and lists." Tr. at 235. These are the only two pieces of medical evidence regarding Plaintiff's residual functional capacity prior to his date last insured. Neither doctor provided medical evidence that Plaintiff has a residual functional capacity to engage in the requisite physical acts of work on a day in day out basis in competitive and stressful conditions in which real people work in the real world. Neither doctor provided medical evidence to support the ALJ's finding that Plaintiff is able to lift 20 pounds occasionally or 10 pounds frequently, or that Plaintiff can stand or sit 30 to 60 minutes at a time, or that Plaintiff can walk two to three blocks at a time. It is the Commissioner's burden to come forward with that evidence. The Commissioner's burden was not met.

After, Plaintiff's date last insured had passed other treating doctors, at the request of the Social Security Administration, rendered opinions regarding his ability to work. Not one doctor stated that Plaintiff is able to function in competitive work activity. The opposite is true. James Yeltatzie, M.D., a psychiatrist who treated Plaintiff, was asked to write a report. On February 15, 1995, after a thorough mental status examination, Dr. Yeltatzie wrote: "Raymond would have difficulties in being able to remember and understand any instructions, procedures or

locations. The pain that he feels as well as his depression impair his attention span, concentration, and his ability to work at any sort of pace." Tr. at 257. In contrast, the ALJ's limitations on mental activity, that he is able to do more than simple routine, repetitive work, which does not require very close attention to detail, and that he is able to work at a regular pace and a mild to moderate level of stress, (Tr. at 92–93) are based on no substantial evidence whatsoever. After Dr. Yeltatzie's examination, the doctors at Disability Determination Services, opined that Plaintiff's mental impairment was severe enough to meet a listed impairment but that the impairment was expected to improve before 12 months had elapsed. Tr. at 163–171. In a note dated December 2, 1996, Dr. Yeltatzie stated: "His psychiatric condition significantly impairs his ability to be gainfully employed and I do not foresee any significant improvement in the future. His prognosis is poor." Tr. at 350. Plaintiff, therefore, meets Listing 12.04 from and after February, 1995.

If Plaintiff's mental status were not enough, he also suffers from cluster headaches, and back problems which were evaluated for Social Security by another treating physician, Richard F. Neiman, M.D. Dr. Neiman, on February 7, 1995 wrote: "From my viewpoint, I think he is totally disabled for all occupations. The back itself is enough to cause problems, intermittent headaches are certainly an aggravating factor." The Doctor continued: "His headaches seem to be under reasonable control. However, when he has headaches he is out probably three to four days." Tr. at 260. The doctor said that Plaintiff's headaches occur about once a month to once every two months. Tr. at 259. Neither of the ALJ's hypotheticals included any limitations caused by headaches, although headaches were listed among the severe impairments. When the VE was asked by Plaintiff's counsel what effect headaches, at the frequency noted by Dr. Neiman, would have on Plaintiff's ability to work (Tr. at 95), the response was: "With such a frequency as you have described, it would be my opinion you would preclude competitive employment." Tr. at 96. There is no evidence in this record that Plaintiff's headaches ever improved to the point that he would be able to work on a sustained basis.

█ In order for the testimony of a vocational expert to constitute substantial evidence, it must be in response to a hypothetical question that sets out the impairments and limitations of the claimant. In *Douglas v. Bowen,* 836 F.2d 392, 396 (8th Cir.1987), the Court wrote: "We cannot accept as substantial evidence a hypothetical which does not precisely state to the expert the claimant's condition." In the opinion of the Court, the hypothetical relied upon by the ALJ did not precisely state the limitations which are supported by the medical evidence in this record.

### CONCLUSION

█ The ALJ found that Plaintiff is unable to do his past relevant work. It was the Commissioner's burden to prove with medical evidence that Plaintiff's has a residual functional capacity for other work, and that other work exists which Plaintiff is able to do in his impaired condition. The Commissioner did not meet his burden on either prong. Furthermore, as pointed out above, it is the opinion of the treating physicians that Plaintiff is not able to do any kind of work. At least from the date of Dr. Yeltatzie's report, February 15, 1995, Plaintiff has met the listings of impairments for mental impairments. The evidence supports a finding that Plaintiff was disabled because of his back problem and headaches prior to his date last insured. In the opinion of the Court, the evidence is transparently one sided against the ALJ's decision. Furthermore, because the vocational expert has already testified that Plaintiff would not be able to work in light of the frequency of the headaches established by the treating physician, a remand to take additional evidence would only delay the receipt of benefits to which Plaintiff is clearly entitled. In such circumstances, a reversal with an order to award benefits is the appropriate remedy. *Talbott* at 515; *Gavin v. Heckler,* 811 F.2d 1195, 1201 (8th Cir.1987).

Although the ALJ wrote extensively regarding Plaintiff's credibility, and, although the Court disagrees with nearly every one of the ALJ's reasons in this regard, this case

does not turn on a proper assessment of Plaintiff's credibility. The issue in this case is whether the Commissioner met his two pronged burden of proving that Plaintiff is able to work. Further discussion of the credibility issue would serve no useful purpose.

Defendant's motion to affirm the Commissioner is denied. **This cause is remanded to the Commissioner for computation and payment of benefits, with an onset of disability of August 22, 1993.** Plaintiff's Motion to Substitute Party is denied. See footnote 1, ante. Upon remand, the Commissions shall determine the party to whom past due benefits shall be paid.

The judgment to be entered will trigger the running of the time in which to file an application for attorney's fees under 28 U.S.C. § 2412(d)(1)(B) (Equal Access to Justice Act). *See Shalala v. Schaefer,* 509 U.S. 292, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).